K. R. Cork and T. D. Redhead, Joint Liquidators of the British Commercial Insurance Company, Limited, a British Corporation, Plaintiffs-Appellees, v. Associated International Insurance Managers, Inc., an Illinois Corporation, Defendant-Appellant.

Gen. No. 49,702.

First District, First Division.

April 26, 1965.

Heineke, Conklin & Schrader, of Chicago (Paul H. Heineke, of counsel), for appellant.

Ashcraft, Olson, Beach, Kimball, Alexander & Edmonds, of Chicago (Norman L. Olson, Jr., of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

This is an action by an insolvent British insurance company to recover the balance of premiums collected for it in Illinois by defendant, an Illinois licensed insurance broker. Defendant appeals from a decree in favor of plaintiff for $5,999.90.

Defendant contends (1) that section 121(4) of the Illinois Insurance Code (Ill Rev Stats, c 73, ¶ 733) bars plaintiff from maintaining this action in any court in Illinois; and (2) in any event, payment of losses out of funds collected as premiums was proper and necessary to the fulfillment of the agreement between the parties. The matter was submitted to the court on the pleadings and a stipulation of facts.

In February 1954, plaintiff, British Commercial Insurance Company, Limited, was a British corporation, engaged in a general insurance business, but it was not authorized or licensed by the Illinois Director of Insurance to write contracts of insurance in the State of Illinois.

Defendant, Associated International Insurance Managers, Inc., an Illinois corporation, engaged in insurance brokerage in Chicago, was licensed as a broker and "surplus line" agent under section 445 of the Illinois Insurance Code (c 73, ¶ 1057) on July 20, 1953, and is currently so licensed.

On February 26, 1954, British Commercial and defendant Associated entered into a so-called "Open Cover Agreement," which authorized Associated to issue policies or other documents binding British Commercial as insurer on certain types of insurance risks located in the United States. Pursuant to this agreement, defendant Associated negotiated risks in Illinois, underwritten by British Commercial in accordance with the agreement on a "surplus line" basis, pursuant to section 445 of the Illinois Insurance Code.

Defendant represented other similar insurers and would bind each of the insurers for a specific portion of the risk insured.

Under the agreement, defendant Associated collected the premium on the "surplus line" risks, usually at rates considerably higher than standard. From these premiums Associated deducted its commission and deposited the balance of the premium in separate bank accounts in Chicago for British Commercial and the other similar insurers, in accordance with their percentage participation in the "surplus line" risk. The bank account for plaintiff was entitled "Associated International Insurance Managers, Inc.—British Commercial Account, . . ."

As losses occurred and expenses were incurred, Associated would withdraw from these bank accounts funds sufficient to pay the losses and expenses, and if the accounts did not contain sufficient funds to pay them, Associated would request the companies involved to transfer additional funds to Chicago. Associated reported monthly to British Commercial the nature and indentity of risks bound, the gross and net premiums collected, losses reported to it, and losses and expenses paid by it. The agreement was terminated on December 31, 1957. After the termination, under the terms of the agreement plaintiff remained liable for losses arising out of risks incurred prior to termination, and defendant continued to pay losses from the funds which it had on hand.

On September 14, 1959, British Commercial failed, and joint liquidators were appointed in Great Britain. On or about September 14, 1959, defendant was notified by the liquidators of the voluntary liquidation, and that no action of any kind should be taken on behalf of British Commercial without prior written consent of the liquidators.

On November 23, 1959, plaintiff received a statement from defendant Associated for the month of October, showing a balance in the British Commercial account of $5,999.90 as of September 30, 1959. On November 23, 1959, a letter was sent by the liquidators to defendant Associated demanding payment of the $5,999.90. On June 6, 1960, defendant Associated withdrew the balance of the British Commercial account but did not forward it to the plaintiff liquidators, and the instant action was filed in September, 1960.

The amended complaint substantially alleged the foregoing. Defendant's answer included as separate defenses (1) that plaintiff may not maintain the cause of action in Illinois, and (2) "that all the funds by it at any time held for British Commercial Insurance Company, Limited, have been exhausted, properly paid to persons having claims against said British Commercial prior to the time of the liquidation." The court decreed that "plaintiff has standing to bring and prosecute this action in this Court," and "that judgment be and is hereby entered in favor of plaintiff, British Commercial Insurance Company, Limited for the benefit of said joint liquidators. . . ."

Initially, defendant contends that "subsection 4 of section 121 of the Illinois Insurance Code . . . effectively bars this plaintiff from maintaining the present action in this or any other court of this state." Defendant relies on the following part of subsection (4):

> ". . . no company transacting insurance business in this State without a certificate of authority shall be permitted to maintain an action at law or in equity in any court of this State to enforce any right, claim or demand arising out of the transaction of such business until such company shall have obtained a certificate of authority. . . ."

Defendant argues that although "section 121 of the Illinois Insurance Code legalizes the transaction of certain types of insurance business by unauthorized companies, to-wit: permitting agents licensed under section 445 to place business with these unauthorized companies, . . . this limited grant of authority does not impliedly and certainly does not expressly carry with it any right on behalf of an unauthorized company to bring an action in the courts of this State. The legislature expressly has denied this privilege to such unauthorized companies by the language of subsection 4 of section 121."

Defendant's contention requires consideration of the provisions of subsection (1) of section 121 and of section 445 of the Insurance Code. Subsection (1) of section 121 (Transacting Business Without Certificate of Authority Prohibited) (c 73, ¶ 733) reads as follows:

> "It shall be unlawful for any company to enter into a contract of insurance as an insurer or to transact insurance business in this State, without a certificate of authority from the Director; *provided that this subsection shall not apply* to contracts procured by agents under the authority of section 445, nor to contracts of reinsurance." [Emphasis supplied.]

Section 445 (Surplus line license) (c 73, ¶ 1057) provides:

> "Any agent or broker licensed in Illinois, may upon payment of an annual license fee . . . be licensed to procure policies or contracts . . . from companies which are not authorized to do business in this State and which have complied with Section 445.1, where such agent or broker is, after diligent effort unable to procure policies or con-

tracts to cover the kind or kinds of business required from the companies duly authorized and licensed to transact business in this State."

Defendant further argues that "the legislative purpose in enacting subsection 4 of section 121 is to close the courts to suits by *all* unauthorized companies, whether their contracts are procured by agents licensed under section 445 or not. The provisions of this statute do not reflect an unreasonable, arbitrary or capricious attitude on the part of the legislature but merely its concern with protecting the rights of its citizens. Because it permits some unauthorized companies to write certain risks in this State, this permission does not have to be enlarged to open the courts of this State to these companies to the same extent they are open to authorized and qualified companies. . . . Lawfully it may withhold from unauthorized companies privileges which it grants to authorized companies, including the right to maintain an action in the courts of this State."

Plaintiff argues that defendant's interpretation of the legislative purpose of subsection (4)—"to close the courts to suits by *all* unauthorized companies, whether their contracts are procured by agents licensed under section 445 or not"—is illogical and inconsistent with the purpose and policy of the Insurance Code and the holding of this court in Equitable Mut. Fire Ins. Co. v. McCrae, 156 Ill App 467 (1910). In that case, a Canadian insurance company, not licensed to do business in Illinois, brought suit against an agent who was licensed to procure insurance in unauthorized companies on a "surplus line" basis, pursuant to statute, for premiums collected by the agent. One of the defenses was that plaintiff was not entitled to bring suit because it failed to comply with the statute regulating the doing of business in this State by foreign corporations. The court held (p 471), "as a matter

of law, that plaintiff, a non-resident insurance company, in issuing its policies through defendant, licensed by the State as agent to transact that kind of business, was not doing business in this State contrary to the statutes." The court relied on "An Act of the State legislature in force July 1, 1903, and now forming a part of chapter 73, Revised Statutes, title 'Insurance', [which] provides for the licensing of brokers to write fire insurance policies in fire insurance companies not authorized to do business under the laws of this state," and considered this statute sufficient to exempt the "non-resident fire insurance companies" from the provisions of any other statutory regulations affecting alien insurance companies.

■ Although the Equitable case was decided long before the enactment of the present "Illinois Insurance Code" (1937), the reasoning and theory of the Equitable case apply here. Subsection (1), section 121, clearly states that "this subsection shall not apply to contracts procured by agents under the authority of section 445. . . ." As it is undisputed that the contracts of insurance procured by defendant were under the authority of section 445, we believe it to be a reasonable interpretation that subsection (4) does not apply to contracts procured under the proviso of subsection (1). As stated by plaintiff, "the prohibition against bringing suits is simply a means of enforcing compliance with our statutes requiring authorization and deterring the transacting of unauthorized insurance business. If the 'surplus line' transactions are authorized, there is no legitimate purpose in denying to 'surplus line' insurers access to the courts." We agree with plaintiff and hold that the trial court was correct in determining that plaintiff "has standing to bring and prosecute this action" in the Circuit Court of Cook County, Illinois.

We consider next defendant's contention that "payment of losses out of funds collected as premiums was proper and necessary to the fulfillment of the agreement between the parties."

Defendant states it was stipulated that all of the expenses and losses paid were incurred and paid by reason of casualties which occurred prior to December 31, 1957, the date of termination; that Article Nine of the Agreement indicates that "both Associated and British Commercial contemplated British Commercial remaining liable after the date the agreement was terminated for all losses arising before the termination"; and that "it was under the terms of this agreement that Associated came into possession of the funds in dispute. It was also in accordance with the terms of this agreement that it paid out these funds in losses."

Plaintiff argues that the "Open Cover Agreement" provided that defendant was to act as agent of plaintiff in negotiating risks to which plaintiff was to be bound; that the bank account was a trust fund held by defendant for the benefit of plaintiff; and that the establishment of a trust account was intended by Article Eleven of the Agreement, which reads as follows:

"Accounts & Balances:

The Coverholder shall render monthly accounts based on a recapitulation of premiums, return premiums and paid losses as provided in Articles Six and Ten. The balances due shall be remitted into the Insurers' Trust Account in Chicago, Illinois."

The bank account established by defendant in its own name carried an additional title designation of "British Commercial Account." It was stipulated that in this account defendant deposited "balances remaining from month to month on the portion of the portfolio underwritten by plaintiff constituting premiums re-

ceived less losses, return premiums and expenses, . . . and the moneys so deposited were withdrawn from said account as needed to pay losses and expenses, which fact was reported monthly to the plaintiff."

We believe that the Agreement between the parties established defendant as plaintiff's agent, reposing in defendant the authority to receive premium payments for plaintiff, to hold them in a segregated bank account, and to withdraw amounts necessary to "pay losses and expenses." The authority of defendant to make any further disbursements from the bank account was effectively revoked by the notice of plaintiff's liquidators sent to defendant on or about September 14, 1959. (3 Am Jur2d, Agency, § 37.) The notice read, in part: "[No] . . . document whatsoever must be signed or initialled for or on behalf of The British Commercial Insurance Co. Ltd., nor must any instruction or authorization of any kind whatsoever be given to any . . . person on behalf of the Company, without the prior written consent or authorization of the Liquidators. . . ." Payments of losses by defendant to claimants, and charged to the bank account after receiving this notice, were in violation of these directions, and were made without authority. The losses paid by defendant to claimant were not "proper and necessary." As said in the Restatement of Agency, 2nd Ed, § 417, p 278:

> "An agent who has received anything on account of his principal cannot defeat the claim of the principal upon the ground that a third person has a right superior to the principal's unless: (a) the agent has been divested of it by, or has delivered it to, the holder of the paramount title. . . ." [Comment (a) stating:] "If the agent surrenders possession without a judgment against him, he normally takes the risk that the claimant is not entitled to the subject matter."

339

■ Since the defendant released funds from the bank account without any compulsion of a judgment against it (the risks under the claimants' policies were incurred by plaintiff), the defendant assumed the risk of liability to the plaintiff for the funds so dispensed. (Restatement of Agency, 2nd Ed, § 382 with Comment *e*, § 402.) Under the terms of the notice of September 14, 1959, the defendant could have protected itself against this risk by requesting "written consent or authorization of the Liquidators" to pay the losses. It also might have been able to bring a declaratory judgment action to determine its rights and responsibilities in regard to the bank account balance.

■ The object of a liquidation proceeding is to treat all creditors in an equitable manner, and defendant's use of plaintiff's funds, to pay plaintiff's obligations, defeated the object of the liquidation proceeding—the equal sharing by creditors in the assets of an insolvent in proportion to their claims. (People v. Marquette Nat. Fire Ins. Co., 267 Ill App 478 (1932).) We conclude the judgment against defendant for $5,999.90 was proper.

For the reasons given, the decree of the trial court is affirmed.

Affirmed.

BURMAN, P. J. and KLUCZYNSKI, J., concur.